**TO: Clerk's Office**
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**APPLICATION FOR LEAVE
TO FILE DOCUMENT UNDER SEAL**

******************************
COMPLAINT

24-mj-00467

Docket Number

******************************

SUBMITTED BY: Plaintiff___ Defendant___ DOJ ✓
Name: Sara K. Winik
Firm Name: USAO - EDNY
Address: 271 Cadman Plaza East
Brooklyn, NY 11201
Phone Number: 718-254-6058
E-Mail Address: sara.winik@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES___ NO___
If yes, state description of document to be entered on docket sheet:

A) If pursuant to a prior Court Order:
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

B) If a new application, the statute, regulation, or other legal basis that authorizes filing under seal

ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY NOT BE UNSEALED UNLESS ORDERED BY THE COURT.

DATED: Brooklyn            , NEW YORK
       July 14, 2024

_____
U.S. MAGISTRATE JUDGE  James R. Cho

RECEIVED IN CLERK'S OFFICE July 14, 2024
                              DATE

**MANDATORY CERTIFICATION OF SERVICE:**
A.) ___ A copy of this application either has been or will be promptly served upon all parties to this action, B.) ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation: _____; or C.) ✓ This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

July 14, 2024                  _____
    DATE                              SIGNATURE

DMP:SKW/GR
F. #2024R00922

24-mj-00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ASIF MERCHANT,
    also known as "Asif Raza Merchant,"

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

<u>COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT</u>

(T. 18, U.S.C., §§ 1958 and 2)

Docket No.

EASTERN DISTRICT OF NEW YORK, SS:

        ANTHONY CIPRIANO, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

<u>COUNT ONE</u><br>(Murder for Hire)

        From at least in or about April 2024 through July 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ASIF MERCHANT, also known as "Asif Raza Merchant," together with others, did knowingly and intentionally travel in interstate and foreign commerce, to wit: from outside the United States to the United States, and from Texas to New York, and use and cause another to use a facility of interstate and foreign commerce, to wit: a cellular telephone, with intent that a murder be committed in violation of the laws of a State and the United States as consideration

for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value.

(Title 18, United States Code, Sections 1958 and 2.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been a Special Agent with the FBI since 2012. I am currently assigned to FBI New York Field Office where I investigate crimes involving terrorism and espionage, including threats from Iran, Hizballah, and the Quds Force.

2. The facts in this affidavit come from my personal observations, my training and experience, information obtained from both government and public records databases, information obtained from other agents, and review of records and documents. When I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated. In addition, many of the statements described herein are based on draft English translations of communications that were not originally made in English and are subject to revision.

3. In my training and experience, I have become aware that the Government of Iran has publicly stated its desire and intention to conduct operations targeting those perceived to be enemies of the Iranian regime, including Americans. In particular, representatives of the Government of Iran have publicly stated the desire to avenge the death

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

of Qasem Soleimani, who was killed on or about January 3, 2020 by a U.S. drone strike in Baghdad, Iraq. In August 2022, a member of the Islamic Revolutionary Guard Corps ("IRGC") was charged with plotting to assassinate the former U.S. National Security Advisor in or around Washington, D.C., likely in retaliation for the death of Soleimani. See United States v. Poursafi, 22 Mag. 176 (D.D.C.). Based on my training and experience as well as the facts and circumstances I have learned in the course of this investigation to date, I believe that the tradecraft and operational security measures used by ASIF MERCHANT as described below (e.g., use of coded language, use of multiple cellular telephones, and removal of cellular telephones to attempt to avoid surveillance) are consistent with a person engaged in this type of plotting on behalf of a foreign adversary.

I. The Defendant

4. The defendant ASIF MERCHANT, also known as "Asif Raza Merchant" ("MERCHANT"), is a citizen of Pakistan. He was born in approximately 1978 in Karachi, Pakistan. MERCHANT has stated that he currently resides in Pakistan. He also stated that he has a wife and children in Pakistan, and that he also has a wife and children in Iran. In his travel records to enter the United States, MERCHANT indicated frequent travel to Iran, Syria, and Iraq. A photograph of MERCHANT is below.



II.  **The Defendant's Plot to Assassinate U.S. Government Officials**

   A.  **Overview**

   5.  Since at least April 2024, MERCHANT orchestrated a plot to assassinate U.S. government officials on U.S. soil. After spending time in Iran, MERCHANT flew from Pakistan to the U.S. to recruit individuals in the U.S. to carry out his scheme. While in the U.S., MERCHANT contacted a person he believed could assist him with the criminal scheme. That person in fact reported MERCHANT's conduct to law enforcement and became a confidential source working with law enforcement (the "CS"). MERCHANT asked the CS to assist him in contracting hitmen. The CS introduced MERCHANT to two purported hitmen, who were in fact undercover U.S. law enforcement officers (the "UCs"). MERCHANT subsequently paid the UCs $5,000 in cash in New York as an advance payment for the plot to murder U.S. government officials.

   B.  **MERCHANT Travels to the U.S. to Prepare His Assassination Plot**

   6.  On or about April 10, 2024, MERCHANT flew from Pakistan to Istanbul and then on to Houston, Texas on or about April 13, 2024, to recruit individuals to carry out his plot to assassinate U.S. government officials. Soon after arriving in the U.S., MERCHANT contacted the CS, under the guise of wanting to discuss potential business opportunities in the U.S.

   7.  On or about April 22, 2024, MERCHANT traveled from Texas to New York to meet with the CS in person. MERCHANT told the CS that he and his uncle in Pakistan sold "yarn-dyed" clothing and suggested that the CS help MERCHANT sell the clothing in the U.S. MERCHANT instructed the CS to create a corporation in the U.S. which would enable them to do business together ("Corporation 1").

8.       While discussing their business plans, MERCHANT told the CS that MERCHANT traveled to Iran two weeks before traveling to the U.S. in April 2024. MERCHANT offered multiple times to pay for the CS to travel to Iran.

9.       In approximately May 2024, after returning to Texas, MERCHANT called the CS on the phone and said that he had an opportunity for the CS to earn up to $100,000 in the "yarn-dyed" clothing business.  MERCHANT told the CS that he wanted to discuss the opportunity in person.

C.       MERCHANT Admits His Murder Plot to the CS

10.      On or about June 3, 2024, MERCHANT flew from Texas to LaGuardia Airport in New York.  The CS picked up MERCHANT from the airport and drove him to a hotel in Nassau County, New York.  While at the hotel, MERCHANT told the CS that the opportunity he had for the CS was not a one-time opportunity and would be ongoing. MERCHANT then made a "finger gun" motion with his hand, indicating that the opportunity was related to a killing.  MERCHANT subsequently took the CS's cellphone and put it in a drawer for security reasons, so they could discuss the plan.  MERCHANT stated that he would give the CS more details about the plan the next day but that he needed the CS to arrange a meeting for MERCHANT to meet hitmen in New York.

11.      The next day, MERCHANT met with the CS in his hotel room and described his scheme in more detail.  At the beginning of the meeting, MERCHANT again took the CS's cellphone and put it in a drawer for security purposes, implying they could be recorded, and told the CS never to speak when the phone was in his pocket.

12.      MERCHANT then explained that his plot involved three different criminal schemes: (1) stealing documents or USB drives from a target's home; (2) planning a

protest; and (3) killing a politician or government official. MERCHANT stated that the victims would be "targeted here," meaning in the United States. He also stated that the "people who will be targeted are the ones who are hurting Pakistan and the world, [the] Muslim world. These are not normal people." In my training and experience, individuals engaged in plots originating overseas to commit acts of violence in the United States often obscure the sponsor or broader purpose of the plot.

13. MERCHANT instructed the CS to arrange meetings with individuals who MERCHANT could hire to carry out these actions. Specifically, MERCHANT requested men who could do the killing, approximately twenty-five people who could perform a protest as a distraction after the murder occurred, and a woman to do "reconnaissance." MERCHANT told the CS that these individuals needed to be trusted. MERCHANT also stated that he wanted the hitmen to procure him an untraceable phone so they could communicate securely.

14. While in the hotel room, MERCHANT took out a napkin and placed objects on the napkin to illustrate a potential assassination plot, including a target (the person to be killed), a crowd, surrounding buildings, and streets. MERCHANT began planning potential assassination scenarios on the napkin and quizzed the CS on how he would kill the target in the various scenarios. Specifically, MERCHANT pointed to the target and repeatedly asked the CS to explain how the target would die. MERCHANT told the CS that there would be "security [] all around" the person. An image of MERCHANT gaming out the assassination plot on the napkin is below.



15.     MERCHANT instructed the CS that it would be better to talk in code and that the phrase "yarn-dye" was a code he used in the past when speaking with the CS about this meeting. The CS responded that he had not realized in the past when MERCHANT mentioned the "yarn-dye" business MERCHANT was speaking in code. MERCHANT told the CS that he should use the company they opened previously—Corporation 1—to transfer money for the plot.

16.     MERCHANT also stated that the plot would occur after he left the U.S., and he would communicate with the CS from overseas using the code words. The CS asked whether MERCHANT had spoken to the "party" back home with whom MERCHANT was working. MERCHANT responded that he had and that the party back home told him to "finalize" the plan and leave the U.S.

17. MERCHANT asked whether the CS was comfortable with the plan and indicated the CS getting paid would not be an issue. MERCHANT further stated that the nature of this work was different than the criminal activity MERCHANT believed the CS had conducted in the past, but that MERCHANT performed "Istikharah from Quran before doing this," meaning MERCHANT prayed to God "about whether [he] should do this work or not" and received clarity from God to carry out his mission.

D. MERCHANT Attempts to Recruit Brooklyn Locals for His Scheme

18. On or about June 5, 2024, MERCHANT met with the CS again and expressed impatience with the CS setting up meetings with potential hitmen. MERCHANT stated that the whole purpose of his trip to New York was to have these meetings. The CS told MERCHANT that he had contacted the hitmen and was setting up a meeting.

19. While MERCHANT waited for the meeting to be scheduled, he instructed the CS to drive him around New York City looking for clubs where he could recruit other individuals to assist in his plot. On or about June 6, 2024, MERCHANT had the CS drive him around Brooklyn to scout clubs. MERCHANT told the CS that through their "yarn-dyed work, God willing, [he] intend[ed] to save . . . up to a million dollars." The affiant believes this means MERCHANT thought they could make up to one million dollars through the criminal scheme.

E. MERCHANT Hires Hitmen to Carry Out the Assassination Plot

20. On or about June 10, 2024, MERCHANT spoke to the CS over the phone and discussed meeting the hitmen in person later that evening. Following the discussion, MERCHANT and the CS met the two hitmen—who were in fact UCs—in Manhattan. MERCHANT advised the UCs that he was looking for three services from them: theft of

9

documents, arranging protests at political rallies, and for them to "kill somebody." MERCHANT stated that the person he wanted them to murder was a "political person." MERCHANT stated that he was willing to pay for these services and have a long-term relationship with the UCs.

21. During the meeting, MERCHANT presented himself as the "representative" in the U.S., indicating that there were other people he worked for outside the U.S. MERCHANT told the UCs that he wanted to pay them in cash through "hawalas"[2] in Istanbul and Dubai. MERCHANT reiterated that the UC's work would be "long-term work" and that most likely he would travel back to Pakistan before giving them further instructions. Using the plural tense to indicate he was working with people overseas, MERCHANT stated that "we" would give the instructions, including the target name, to the hitmen either the last week of August 2024 or the first week of September 2024, when MERCHANT was out of the U.S. The UCs told MERCHANT that they would provide him with a secure cellular phone to communicate with them, as MERCHANT had requested of the CS, and would be in touch about how much their services would cost. MERCHANT told the UCs: "I will assure you will not regret me."

22. On or about June 12, 2024, MERCHANT met one of the UCs again and obtained the cellular phone from the UC to use in furtherance of the assassination plot. During the meeting, MERCHANT agreed to pay the UCs a $5,000 advance payment for the plot. MERCHANT stated that it would take him a week to obtain the money but that he would

---

[2] I am aware based on my training and experience that a "hawala" is an informal and unregulated method of transferring money, often between two countries, without any physical money moving. Typically, the system requires two hawaladars, one in each country, to handle the transaction without money being wired overseas.

pay the UCs in either New York or Las Vegas.

### F. MERCHANT Creates Coded Language for the Plot

23. Following the meeting with the UC, MERCHANT met with the CS again in furtherance of the plot. On or about June 13, 2024, MERCHANT met with the CS and wrote out coded language on a piece of paper that he instructed the CS to copy down and use when communicating with him in the future. MERCHANT wrote that the word "tee-shirt" would mean a "protest," which he described as the "lightest work." The phrase "flannel shirt" would mean "stealing," which was "heavier work." The phrase "fleece jacket," the heaviest work, would mean "the third task . . . commit the act of the game," indicating murder as previously discussed. The phrase "denim jacket" referred to "sending money." MERCHANT told the CS to use the code words only orally on the phone and not to text them.

24. MERCHANT further instructed the CS to run the legitimate clothing business they previously discussed to serve as a front for the plot so they could maintain communication. MERCHANT also indicated an affinity for Iran and told the CS that the money they were using for the plot was "halal," meaning permitted.

### G. MERCHANT Arranges Money to be Sent to the U.S. for the Assassination Plot

25. After meeting with the purported hitmen, MERCHANT traveled to Boston, Massachusetts, and began arranging means to obtain the $5,000 cash advance to pay the hitmen. On or about June 18, 2024, in a telephone call with an associate in the U.S., MERCHANT asked for assistance obtaining $5,000. MERCHANT told the associate that it was difficult to obtain the money from Pakistan because everything was closed due to the Eid holiday. MERCHANT instructed the associate to transfer $5,000 through a "hawala" which MERCHANT would pay him back either in Pakistan or via a "hawala."

26. On or about June 20, 2024, MERCHANT contacted that associate again on the phone regarding the $5,000. The associate asked if he could transfer the money to a bank account, to which MERCHANT responded that it had to be cash and he needed it by "Friday," meaning by June 21, 2024.

27. Later that day, MERCHANT called the CS and told the CS that he had arranged for someone to give the CS the $5,000. MERCHANT instructed the CS to take a photograph of a serial number on a $1 bill and text the image to MERCHANT. MERCHANT explained that he would send the image of the serial number to the person with the $5,000. Then, when the CS went to pick up the money, he would show the person the serial number as verification. MERCHANT stated that the CS should expect a call from the individual when the money was ready, and that the money would probably come from Pakistan. MERCHANT explained that after the CS received the money, MERCHANT would travel back to New York, collect the money from the CS, and deliver it to the hitmen.

28. On or about June 21, 2024, at approximately 5 a.m., the CS received a series of missed WhatsApp calls from an overseas telephone number that had a display name of someone the CS knew to be MERCHANT's cousin living overseas. The CS called the number back, and the person asked whether the CS had received the $5,000. The CS responded that he had not received the money. The person then gave the CS a telephone number to contact to pick up the $5,000. Later that day, the CS texted the number and picked up the $5,000 in Queens, New York. As instructed by MERCHANT, the CS showed the serial number of the dollar bill to the individual, and the individual then handed over the $5,000.

H.MERCHANT Makes an Advance Payment for the Assassination Plot

29.On or about June 21, 2024, MERCHANT traveled from Boston to New York to make the advance payment to the hitmen for the assassination plot.   The CS picked MERCHANT up at a bus station.   MERCHANT took possession of the $5,000 in cash that the CS had picked up for MERCHANT.   MERCHANT then met the UCs in Manhattan.

30.After the UCs arrived, MERCHANT handed over the $5,000 in cash to them.   A photograph of the $5,000 is below.



31.After MERCHANT paid the $5,000 to the UCs, one of the UCs stated "now we're bonded," to which MERCHANT responded "yes."   The UC then stated "Now we know we're going forward.   We're doing this," to which MERCHANT responded "Yes, absolutely."

32.MERCHANT reiterated that the plan was for the UCs to go forward with his three plots—the assassination, the protest, and the stealing of documents.   MERCHANT added that he wanted the UCs to launder money for him as well.   MERCHANT explained that

he would return to Pakistan before giving the UCs additional details about the murder plot. MERCHANT suggested meeting the UCs in Dubai or Istanbul to convey the instructions because it would be "easier" for him. MERCHANT reiterated that the plot would occur in the U.S. MERCHANT ended the meeting by telling the UCs that he would be in touch to deliver further instructions.

33. MERCHANT subsequently made flight arrangements and planned to travel out of the U.S. on Friday, July 12, 2024. On or about July 12, 2024, law enforcement agents observed MERCHANT place his luggage in the trunk of a vehicle outside his place of residence. Law enforcement subsequently arrested MERCHANT and searched his place of residence and his person pursuant to a lawfully executed search warrant. During the search, law enforcement agents searched MERCHANT's wallet and found the handwritten note inside with the code words that MERCHANT invented to communicate about the assassination plot. A photograph of the piece of paper with the code words is below.



14

## **CONCLUSION AND REQUEST FOR SEALING**

34. It is respectfully requested that this Court issue a limited order sealing, until further order of the Court, this Complaint. Premature disclosure of the contents of this Complaint will seriously jeopardize the investigation, including by giving other subjects and potential targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, and notify confederates. Some of the evidence in this investigation is stored electronically and can be completely and permanently erased. Some of the evidence in this investigation involves communications that can be transferred to alternate platforms (including encrypted platforms and platforms beyond the jurisdictional reach of U.S. legal process). If alerted to the existence of the complaint, there is reason to believe that other subjects under investigation will destroy that evidence and change their patterns of behavior.

35. It is respectfully requested that the Court limit the sealing order such that the Complaint be unsealed for the limited purpose of disclosure to the defendant and defense counsel, the United States District Court for the Southern District of Texas, the district in which the defendant was arrested on Friday, July 12, 2024 for the purposes of presentment, as well as to relevant United States, foreign, or intergovernmental authorities, at the discretion of the United States and in connection with efforts to prosecute the defendant, or as otherwise required for purposes of national security. We request that the Complaint otherwise remain sealed until further order of the Court.

WHEREFORE, your deponent respectfully requests that the defendant ASIF MERCHANT, also known as "Asif Raza Merchant," may be dealt with according to law.

_____
ANTHONY CIPRIANO
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Affidavit by reliable telephonic and electronic means
pursuant to Federal Rule of Criminal Procedure 4.1, this
14th day of July, 2024

_____
THE HONORABLE JAMES R. CHO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK